Edward Carlson
Law Office of Edward Carlson
43 West 43rd St., suite 243
New York, NY 10036-7424
+1 (917) 714-0189
ed@edwardcarlsonlaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUKOIL PAN AMERICAS, LLC<br><br>Plaintiff,<br>against<br><br>SHELL TRADING (US) COMPANY,<br><br>Defendant. | 20 CV _____<br><br>**COMPLAINT IN ADMIRALTY** |

**COMPLAINT**

Plaintiff Lukoil Pan Americas, LLC (hereinafter "Lukoil" or Plaintiff'), as and for its Complaint against Defendant Shell Trading (US) Company ("Shell"), alleges upon information and belief as follows:

**1.** This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a contract that provides for ocean maritime transportation and delivery services, and hence qualifies as a maritime contract for purposes of jurisdiction. As such, this case falls under the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.

**2.** The Court also possesses diversity jurisdiction pursuant to 28 U.S.C. § 1332 in that the action arises between a citizen of one of the United States and a citizen of another of the United States, as more particularly appears below, with the amount in controversy (exclusive of interest and costs) in excess of the sum of $ 75,000.

3.   At all times material hereto, Plaintiff Lukoil was and still is a business entity duly organized and existing under the laws of Delaware with an office and place of business in this District.

4.   At all times material hereto, Defendant Shell was and still is a business entity duly organized and existing under the laws of Delaware with an office and place of business in Houston, Texas.

5.   Shell has repeatedly ignored Lukoil's efforts to commercially resolve this matter, thereby necessitating the commencement of this lawsuit.

## Contract Terms

6.   On December 17, 2015, Lukoil agreed to procure, load, transport, deliver and sell to Shell on DAP terms by oceangoing tanker a cargo of approximately 300,000 barrels of Reformulated Gasoline Blendstock for Oxygen Blending (RBOB) to Defendant Shell at New York Harbor, New York, USA.

7.   The contract contemplated that the cargo would be loaded onboard a vessel nominated/chartered by Lukoil, transit by sea to New York Harbor, USA, and there make delivery DAP one safe/port New York Harbor, with payment to be made within two (2) New York Banking Days following the tender of an invoice and supporting documents.

8.   Pursuant to the contract terms, Lukoil chartered the oceangoing tanker STI Dama and ordered the vessel to transport the cargo from Sines, Portugal and deliver the RBOB cargo at New York Harbor.

9.   The contract also set forth the rate at which the vessel was required to discharge the cargo, when discharge would be commenced, and how "laytime" would be calculated for purposes of demurrage/dispatch.

10.   "Laytime," "demurrage" and "despatch" are terms utilized in the maritime industry and relate to the time used to load and discharge cargo. Laytime is a set time afforded

for loading and discharge of the cargo, with demurrage representing liquated damages due to a vessel owner/disponent owner for delays which occur when a vessel does not load or discharge cargo within the stipulated laytime.

11.     Under the terms of the contract, laytime at the discharge port was to commence six (6) hours after the vessel tendered its "Notice of Readiness" (commonly referred to as "NOR") that the vessel was ready in all respects to discharge at the place agreed upon for the discharge, or upon the vessel being securely moored at berth, or other discharging place, whichever occurred first.

12.     Under the terms of the contract, demurrage was set at $ 17,000/day, pro rata for any portion where the discharge exceeded the allowable laytime.

13.     The contract also incorporated the form ISPS [International Ship and Port Facility Security] clause of BIMCO [the Baltic and International Maritime Council], as well as other oil pollution clauses, and the Litasco General Terms and Conditions, which set forth, *inter alia,* in greater detail, these vessel, carriage, delivery and demurrage provisions.

### Nomination of the Vessel, Shipment and Performance under the Contract

14.     In accordance with the contract, Lukoil nominated the M/T STI Dama as the vessel to perform the carriage of the cargo.

15.     Lukoil's nomination of the vessel set forth the vessel's dimensions and flag, the place of loading, and discharge at the designated discharge port.

16.     Shell accepted the nomination of the vessel to carry and deliver the cargo under the contract.

17.     Subsequent to the loading of the cargo, ocean bills of lading were issued which identified a quantity of 37,000 metric tons of RBOB loaded onboard.

18.     On August 1, 2016, upon the end of sea passage, the vessel issued a first of many Notices of Readiness and remained awaiting berthing for discharge until August

16, 2016. Thereafter, discharge of the cargo was suspended on multiple occasions, before finally completing discharging of cargo on August 17, 2016.

**19.** The amount of time used to discharge the cargo exceeded the allowable laytime.

**20.** The total accumulated laytime incurred, after all applicable contractual deductions, was 146 hours and 17 minutes.  As a result, the vessel incurred $103,617.36 of demurrage at New York Harbor.

**21.** Lukoil paid this sum to Owners of the M/T STI Dama pursuant to the terms of the charter and then sought reimbursement from Shell as per the sales contract.

**22.** More specifically, on September 1, 2016 Lukoil, via email correspondence, informed Shell of the demurrage calculations and enclosed all available supporting documents.

**23.** Shell responded on September 7, 2016, acknowledging receipt of the claim for demurrage reimbursement and indicating the claim was being assigned to a Demurrage analyst.

**24.** Commercial communications followed. Emails between Lukoil and Shell, dated December 8, 2016, involved discussion of the demurrage calculations and the requisite contract provisions.

**25.** Communications from Shell then paused until April 2018 when commercial correspondence resumed regarding the long-outstanding debt.

**26.** On April 18, 2018, Shell advised via internal commercial discussions – "I am working with my commercial operator on this and hope to have comments of agreement soon."

**27.** In October 2018, Shell requested that original claim documents be re-sent.

**28.** On November 12, 2018, in an email correspondence with Shell representative Chika Izuaker, concerning various demurrage claims, Mr. Izuaker stated, in part, "*The STI Dama is correct in terms of calculations*, however due to us not being able to

recover from our receiver on the other side, our trader is pushing back…" [emphasis added].

**29.** On August 16, 2019, plaintiff's P&I insurer sent a demand to Defendant Shell for the outstanding sum of $103,617.36.

**30.** Follow-up correspondence was sent January 11, 2020.

**31.** Defendant Shell did not respond to the correspondence. Shell has failed to make any payment whatsoever to Lukoil against the demurrage, which remains due and owing.

**32.** Despite due demand, and in breach of the contract, Shell has declined and/or refused to make any payment against the demurrage claim.

**33.** As such, Lukoil makes claim for the full recoverable demurrage due under the contract, which equals $103,617.36 (representing 146 hours and 17 minutes, less allowed laytime of 36 hours, at $17,000 per day, pro rata).

**34.** Defendant Shell, as per documented correspondence, acknowledges that the demurrage calculations are correct.

**35.** The contract provides for the application of New York law and suit in this District Court, with service of process via registered mail.

**36.** In addition to the principal amount of demurrage that is due, Lukoil seeks interest which, as specified in the contract, is set at two percentage points over the average JPMorgan prime rate.

**37.** During the period the demurrage has been outstanding, the average prime rate at JPMorgan Chase was 4.5%.

**38.** Lukoil calculates the interest component of its claim against Shell as $25,645.30, representing 6.5 percent over the period the demurrage charge has been outstanding and projected out for a further two-year period at which time judgment is anticipated.

**39.** Further, and to the extent this Court, as a court sitting in Admiralty, has the equitable power to award legal fees where the conduct of the defendant so warrants,

Lukoil also legal fees incurred in connection with the prosecution of this demurrage claim, estimated to be $100,000, with estimated recoverable costs of $5,000.

**40.** In total, therefore, Lukoil estimates, as nearly as can be contemplated, that the total judgment will be $234,262.66, inclusive of the principle amount of this claim, interest, costs and attorneys' fees.

WHEREFORE, Plaintiff Lukoil Pan Americas prays:

a. That process in due form of law according to the practice of this Court may issue against Defendant Shell citing it to appear and answer the foregoing, failing which judgment by default be entered seeking recovery of the principal claim plus interest, costs and reasonable attorneys' fees; and

b. For such other, further and different relief, as the Court may deem just and proper in the premises.

Dated:   New York, New York **April 3, 2020**

                                                Law Office of Edward Carlson
                                                Attorney for Plaintiff

By:   /s/ _____

                                                Edward Carlson
                                                43 West 43rd St., suite 243
                                                New York, NY 10036-7424
                                                +1 (917) 714-0189
                                                ed@edwardcarlsonlaw.com